UNITED STATES DISTICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

SIERRA CLUB,

Plaintiff,

v.

CENTURY ALUMINUM OF SOUTH CAROLINA, INC.,

Defendant.

Civil Action No. 2:26-cv-5268-RMG

**COMPLAINT**

(JURY TRIAL DEMANDED)

## STATEMENT OF THE CASE

1. Every day Century Aluminum of South Carolina, Inc. exposes the residents of Goose Creek, South Carolina, to a stew of harmful gases and particles from its Mt. Holly primary aluminum smelter (Mt. Holly Smelter). These emissions, which have persisted since at least 2019 in violation of the federal Clean Air Act, threaten residents' health and impose other serious social and economic costs on the plant's neighbors. In the absence of government action to stem this illegal pollution, Plaintiff Sierra Club turns to this Court for relief.



*Figure 1: The Mt. Holly Smelter*

2. For years, residents in the neighborhoods adjacent to the Mt. Holly Smelter have complained of serious health problems, including acute upper and lower respiratory distress, gritty and irritated eyes, and relentless coughs. Trusted allergy treatments have provided no relief, and such symptoms have extended well beyond the typical allergy season. As the Smelter's air pollution problems have become more serious and frequent, these and other health issues experienced by residents have worsened. When out-of-town relatives visit, they too have developed such symptoms.

3. White dust from the Mt. Holly Smelter has periodically rained down on the residents' lawns, plants, patios, bedrooms, and vehicles (even when kept in the garage). At times, the white dust has recoated residents' properties for days and has

been so heavy that it appeared to be snowing outside. The white dust has fueled residents' persistent concerns that the Mt. Holly Smelter is harming their health and properties.

4. To protect themselves, residents have shut their windows to keep polluted air out of their homes, refrained from landscaping their properties, abstained from taking daily walks through their neighborhoods, and out-of-town relatives have visited less frequently. The Smelter's persistent and ongoing air pollution problems have forced residents to forgo activities they enjoy, see loved ones less often, and shoulder additional expenses.

5. The residents' suffering stands in stark contrast to Goose Creek's generally well-thought-of reputation: a thriving, fast-growing city that is among the best places in South Carolina to raise a family.

6. These harms and others have been caused by the Mt. Holly Smelter's significant, repeated, and ongoing violations of federal clean air requirements.

7. Illegal air pollution emitting from the Mt. Holly Smelter includes sulfur dioxide, particulate matter, and total fluorides emissions, including hydrogen fluoride, a federally listed hazardous air pollutant (HAP).

8. The U.S. Environmental Protection Agency (EPA), along with numerous peer-reviewed scientific studies, has found that each of these pollutants poses a grave risk to people's health and well-being, including causing respiratory

distress and cardiovascular problems like heart attacks and strokes, in addition to other environmental threats. Repeated exposure to all three pollutants over time compounds these risks.

9. Nearby residents have repeatedly pressed state and local officials to protect their communities from the dangers posed by the Mt. Holly Smelter. But their pleas have largely been ignored. At best, the State has issued a toothless consent order and a slap-on-the-wrist fine, which have failed to deter Century Aluminum from continuing to violate federal clean air law and have not solved the underlying air pollution problems.

10. Plaintiff Sierra Club seeks to enforce the significant, repeated, and ongoing violations of the Clean Air Act and its implementing regulations at the Mt. Holly Smelter on behalf of its members, several of whom live just outside the Smelter's gates and who have suffered the above-described harms, among others.

11. This Complaint seeks declaratory and injunctive relief and the imposition of civil penalties, payable to the U.S. Treasury, under the Clean Air Act, 42 U.S.C. §§ 7401- 7675, and its implementing regulations, including the South Carolina State Implementation Plan, 40 C.F.R. §§ 52.2120-2141.

12. Sierra Club requests a jury trial.

## JURISDICTION

13. This court has subject matter jurisdiction over the claims in this Complaint pursuant to 42 U.S.C. § 7604(a) (citizen suit provision of the Clean Air Act), 28 U.S.C. § 1355(a) (recovery of penalties), and 28 U.S.C. § 1331 (stating that "district courts . . . have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States").

14. The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment) and 42 U.S.C. § 7604(a) (authorizing the imposition of civil penalties and injunctive relief).

## VENUE

15. Under 42 U.S.C. § 7604(c)(1), venue lies in the District of South Carolina because that is the location of the Mt. Holly Smelter.

16. This matter is filed in the Charleston Division of the District of South Carolina because the Mt. Holly Smelter is in Berkeley County.

17. To the extent required by 42 U.S.C. § 7604(b)(1)(A), on February 20, 2026, Sierra Club notified in writing, by certified mail, Century Aluminum of South Carolina, Inc. and its registered agent, Century Aluminum Co., the Governor of South Carolina, the South Carolina Department of Environmental Services (SCDES), the EPA, and EPA Region 4 of the violations alleged in this Complaint.

A true and accurate copy of Sierra Club's February 20, 2026 notice letter is appended as Attachment 1.

18. More than sixty days have passed since Sierra Club's February 20, 2026 notice letter was postmarked and served via certified mail. Attachment 1, at 25-26.

19. Neither the State of South Carolina (State) nor EPA has commenced or is diligently prosecuting a civil action in court to require Century Aluminum of South Carolina's (Century Aluminum) compliance with the violations alleged in this Complaint.

**PARTIES**

20. Plaintiff Sierra Club is a national nonprofit organization of approximately 593,798 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The South Carolina Chapter of the Sierra Club has approximately 6,386 members in the state of South Carolina.

21. Sierra Club is an environmental organization with a long history of service to residents and communities in South Carolina, including in the communities most directly affected by air pollution from the Mt. Holly Smelter.

22. For years, Sierra Club has closely monitored, and been concerned about, the large amount of pollution that the Mt. Holly Smelter emits given the significant harm it causes to nearby residents, including Sierra Club members, and the environment. Member harms are more specifically alleged in paragraphs below.

23. Century Aluminum of South Carolina, Inc. (Century Aluminum) is a Delaware corporation and owns and operates the Mt. Holly Smelter.

**FACTUAL BACKGROUND**

24. The Mt. Holly Smelter, located at 3575 Highway 52 in Goose Creek, South Carolina, is owned and operated by Century Aluminum.

25. The Smelter has a production capacity of more than 250,000 tons of aluminum per year.

26. The Smelter's aluminum production has changed several times over the years. In 2002, the Mt. Holly Smelter received approval to increase its production capacity from 234,274 tons per year to 256,150 tons per year. In 2016, the production capacity decreased by about half when the Smelter temporarily shut down production from Potline #2. In 2022, the Smelter restarted production from Potline #2 West; and, in 2026, the Smelter returned to full production with all four potlines operating.

27. The Mt. Holly Smelter is comprised of two center-worked prebaked potlines that reduce alumina ore, a white powdery chemical compound, to elemental

aluminum. Various infrastructure and equipment support the production process, including a green carbon plant, a carbon anode baking furnace, a casting plant (or foundry), and equipment for anode rodding and pot repair.

28. The Mt. Holly Smelter has two potlines consisting of 180 pots, for a total of 360 pots at the smelter. Each pot is the size of a small school bus. The potlines are housed in separate potroom buildings. Each has an East and West building for a total of four potroom buildings (Potline #1 East, Potline #1 West, Potline #2 East, and Potline #2 West). Each potroom building at the Mt. Holly Smelter is longer than several football fields.




*Figure 2: Overhead view of the Mt. Holly Smelter Potlines*

**<u>Primary Aluminum Production</u>**

29. To produce aluminum from alumina, the Mt. Holly Smelter uses the Hall-Héroult electrolytic process.

30. During that process, carbon anodes are inserted into the top of carbon-lined pots. The pots contain a combination of dissolved alumina, electrolytic bath (molten cryolite), and additives.

31. Carbon anodes are massive, block-like electrodes made of baked carbon that serve as the positive electrical terminal in the electrolytic chemical reaction that forms aluminum. A "green" carbon anode is a "raw," prebaked anode.

32. Anode rodding is the process in which baked carbon anodes are attached to heavy metal rods so they can conduct electricity and be safely suspended inside an aluminum smelting pot.

33. The electrolytic baths generally operate at very high temperatures of about 950 degrees Celsius (or about 1,740 degrees Fahrenheit) and often include fluoride compounds that help reduce the melting point of the alumina.

34. To reduce alumina to aluminum, an electric current is passed from the carbon anode (suspended with anode rodding) through the bath to a carbon cathode located under the mixture. The electrical current causes the reduction of alumina to produce molten aluminum by breaking the chemical bond between aluminum and oxygen. The aluminum sinks to the bottom of the pot where it is periodically siphoned off. The oxygen reacts with carbon in the anode to form $CO_2$.

35. Aluminum production is an emissions-intensive process. The emissions from the pots include:

36. fluorides, both particulate fluorides and gaseous hydrogen fluoride (HF), a federally listed HAP;

37. particulate matter (PM), both "coarse" particulate ($PM_{10}$, i.e., particles 10 micrometers in diameter or smaller) and "fine" particulate ($PM_{2.5}$, i.e., particles 2.5 micrometers in diameter or smaller);

38. sulfur dioxide ($SO_2$);

39. and various other pollutants, such as carbon monoxide, carbon dioxide, volatile organic compounds, and several additional federally listed HAPs (e.g., polycyclic organic matter, carbonyl sulfide).

40. To collect the pots' emissions, hoods are located over each pot and connected to ductwork with exhaust fans that route the gases to the potrooms' air pollution controls.




*Figure 3: Pots within a potroom at the Mt. Holly Smelter*

41. The air pollution controls for the potrooms' duct-fan system consist of dry alumina scrubbers, which use raw alumina powder as the primary scrubbing agent to capture fluoride emissions, followed by baghouses that capture the reacted alumina sorbent and other particulates. The baghouses consist of a multi-step filtration and filter bag cleaning process that uses rows of long, fabric cylindrical tubes resembling socks. Each potroom building has its own dry alumina scrubber/baghouse. The scrubber/baghouse system controls only fluoride and PM emissions, not $SO_2$ emissions.

42. Emissions remaining after these controls are routed through stacks that emit pollution into the atmosphere. Each potroom building has its own stack, for a total of four potroom stacks. The potroom building stacks are emission points relevant to claims in this Complaint.

43. For various reasons, including the physical and operational processes in the potrooms, not all potroom emissions are collected by the above duct-fan system, which routes emissions to a scrubber and a baghouse. Some potroom emissions escape uncontrolled through the roof vents (also referred to as ridge vents). The roof vents, which run along the length of the potroom buildings, do not have any pollution controls.

44. Emission points in the potroom buildings, including the potroom roof vents and the scrubber/baghouse stack, are relevant to claims in this Complaint.

## **Carbon Anode Production**

45. The carbon anodes used in the potrooms are generally formed and baked onsite in the Green Carbon Plant and the Baked Carbon Plant.

46. Carbon anode production is a two-step process. First, in the Green Carbon Plant, "green" unbaked anodes are formed both from calcined petroleum coke, coal tar pitch, recycled green and baked anode material, and remaining carbon anodes (called spent anode butts) leftover from the above aluminum smelting process. Second, the green anodes are baked in the anode bake furnace in the Baked Carbon Plant.

47. The anode bake furnace consists of a large number of sunken ovens or pits in which the green anodes are arranged in rows, covered with a layer of fluid

coke to reduce heat loss, and fired. At the Mt. Holly Smelter's Baked Carbon Plant, these ovens are indirectly fired by natural gas.

48. The carbon anode baking process produces several air pollutants including PM, sulfur oxides (including $SO_2$), carbon monoxide, nitrogen oxides, fluorides, and carbon dioxide, as well as several listed HAPs, including HF, polycyclic organic matter, and carbonyl sulfide.

49. The gases leaving the anode bake area are collected into flues and routed using an exhaust fan to a dry alumina scrubber, which is designed to capture fluorides. A baghouse then captures the reacted alumina sorbent and other particulates. The remaining emissions exit through a single stack for the anode bake furnace.

50. This anode bake furnace stack is an emission point relevant to claims in this Complaint. The anode bake furnace does not have $SO_2$ pollution controls.

**<u>Relevant Mt. Holly Smelter Emissions</u>**

51. Each of following pollutants—$SO_2$, PM (including $PM_{10}$ and $PM_{2.5}$), and total fluorides—is relevant to claims in this Complaint.

*a.* $SO_2$

52. The Mt. Holly Smelter is a major stationary source of $SO_2$. In 2024, the Mt. Holly Smelter emitted more than 3,000 tons of $SO_2$ pollution.

53. The raw materials used in forming carbon anodes, i.e., the calcined petroleum coke, the coal tar pitch, and the fluid coke used in baking anodes, all contain sulfur.

54. At the Mt. Holly Smelter, there are three primary sources of $SO_2$ emissions: (1) the green anode formation process where "green" anodes are formed at the smelter from crushed spent anodes, petroleum coke, and tar pitch; (2) anode formation in the bake ovens, wherein the green anodes are baked in natural gas-fired furnaces to produce baked anodes; and (2) the aluminum reduction process in the potrooms, wherein molten aluminum is produced in reduction pots using the Hall-Héroult electrolysis process.

55. Of these two processes, the latter—aluminum reduction—represents the vast majority of total facility-wide $SO_2$ emissions (2,814 tons $SO_2$ in 2025). During reduction, the sulfur in the anodes is primarily released as the anodes are consumed. Based on Century Aluminum's documentation, the released sulfur is emitted primarily in the form of $SO_2$ and, to some extent, as carbonyl sulfide and other reduced sulfur compounds.

56. At the Mt. Holly Smelter, petroleum coke is the primary raw material used to manufacture consumable carbon anodes. Thus, an increase in the sulfur content of petroleum coke can significantly increase the amount of $SO_2$ emitted by the Mt. Holly Smelter.

57. $SO_2$ emissions from industrial sources, like the Mt. Holly Smelter, harm human health and the environment.

58. $SO_2$ pollution has long been "a medically recognized threat to human health." *Ohio Power Co. v. EPA*, 729 F.2d 1096, 1097-98 (6th Cir. 1984). High levels sustained for mere days can even be fatal. *Id.* (quoting *Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d 1150, 1153, 1155 (6th Cir. 1978)). The EPA also has found a causal relationship between short-term exposure to $SO_2$ pollution and respiratory morbidity. *See, e.g.*, 75 Fed. Reg. 35,520, 35,525 (June 22, 2010). Such health threats can occur even when the ambient level of $SO_2$ pollution does not exceed the National Ambient Air Quality Standards (NAAQS).

59. A pernicious problem with $SO_2$ pollution is that it reacts with other compounds in the atmosphere to form $PM_{2.5}$ pollution. $SO_2$ that converts into $PM_{2.5}$ aggravates respiratory illness, contributes to acid deposition, falls to earth as acid rain, and impairs visibility.

60. Particulate sulfate can comprise a significant portion of total $PM_{2.5}$ concentrations, particularly in regions downwind of significant $SO_2$ emissions sources like the Mt. Holly Smelter. The impacts of particulate sulfate can occur close to the pollution source. Primary aluminum smelters are a well-known cause of particulate sulfate in the atmosphere.

61. It is also well-established that $SO_2$ pollution can contribute to haze and impair visibility through its conversion in the atmosphere to $PM_{2.5}$ pollution.

62. The State has found that the Mt. Holly Smelter is among the most significant contributors to visibility impairment at Cape Romain National Wildlife Refuge. S.C. Dep't of Health & Env't Control, *Final Regional Haze State Implementation Plan for South Carolina Class I Federal Areas* (Mar. 3, 2022).

63. Harms to human health and the environment can be alleviated by reducing exposure to $SO_2$ pollution and, here, by reducing $SO_2$ emissions from the Mt. Holly Smelter.

*b.* PM, $PM_{10}$, & $PM_{2.5}$

64. The Mt. Holly Smelter is a major stationary source of PM, $PM_{10}$, and $PM_{2.5}$. In 2025, when the plant was operating at roughly 75% capacity, Century reported direct PM emissions just from the potlines of 379 tons per year.

65. Sources of PM emissions at the Mt Holly smelter include the aluminum reduction in the potrooms (from which PM is emitted from the potroom roof vents and from the dry alumina scrubber/baghouse stacks) and the anode bake ovens (from which PM is emitted from the dry alumina scrubber/baghouse stack).

66. PM emissions include particles of any size (e.g., dust, smoke, and drops) and can be made of hundreds of different chemicals. $PM_{10}$ (10 micrometers

or smaller) and $PM_{2.5}$ (2.5 micrometers or smaller) are comprised of smaller particles.

67. As the smallest particles, $PM_{2.5}$ emissions can penetrate deep into lung tissue and bloodstream and, according to the EPA, "pose the greatest problems" of all types of PM. EPA, *Health and Environmental Effects of Particulate Matter (PM)* (May 5, 2026), https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.

68. EPA and numerous peer-reviewed scientific studies have found that breathing $PM_{10}$ and $PM_{2.5}$ pollution can cause a multitude of health complications:

- premature death (e.g., heart attacks, strokes, cancers);
- severe respiratory problems (e.g., asthma, acute and chronic bronchitis, lung damage, respiratory inflammation, coughing, wheezing, sneezing);
- irritation of the eyes, nose, and throat; and
- sudden infant death syndrome, birth defects, and low birth weight.

$PM_{10}$ and $PM_{2.5}$ pollution are especially dangerous for the elderly, children, and people with existing health conditions.

69. Short-term exposure, over hours to days, can cause respiratory irritation, trigger asthma and worsen chronic obstructive pulmonary disease, elevate blood pressure, and increase the risk of heart attacks, even at low levels.

70. Long-term exposure, over months to years, causes a gradual decline in lung capacity, impairs lung growth in children, causes chronic respiratory disease, and elevates mortality risk.

71. In addition to its significant health risks, PM pollution causes haze, impairs visibility in the environment, and alters nutrient balances in waters and soils, which harms ecosystems and puts flora and fauna at risk, including sensitive native species.

72. According to the EPA, $PM_{2.5}$ pollution is "the main cause of reduced visibility (haze) in parts of the United States[.]" EPA, *Health and Environmental Effects of Particulate Matter (PM)* (May 5, 2026), https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.

73. Harms to human health and the environment can be alleviated by reducing exposure to PM pollution and, here, by reducing PM emissions from the Mt. Holly Smelter.

*c.* Total Fluorides

74. The Mt. Holly Smelter is a significant source of fluoride emissions, including gaseous fluoride emissions (including HF and perfluorocarbons (PFCs)) and particulate fluorides (e.g., aluminum fluorides, calcium fluorides, and cryolite as particulates). All fluoride compounds, including HF and particulate fluorides, are regulated together under the category of total fluorides (TF). *See* 40 C.F.R. § 60.191

(defining TF for New Source Performance Standards (NSPS) for primary aluminum reduction plants).

75. In 2025, the smelter emitted more than 78 tons of fluorides. The potlines are the primary source of fluoride pollution at the Mt. Holly Smelter, and the Baked Anode Plant is also a key source of fluoride emissions.

76. At aluminum smelters, HF and other fluoride compounds are especially concerning given the quantities in which they are emitted from smelters and the threat they pose to human health and the environment. Peer-reviewed studies have found that the primary fluoride pollutants from aluminum smelters are HF gas, sodium and aluminum fluoride, and cryolite particles.

77. Even over short-term exposure, the EPA and peer-reviewed scientific studies have found that gaseous HF and other fluoride compounds can cause severe respiratory damage in humans and pulmonary edema. Such harms can occur immediately. The Centers for Disease Control and Prevention (CDC) has found, for example, that exposure to HF gas or particulate fluorides can immediately irritate people's eyes and respiratory tracts and cause severe lung damage. CDC, *Hydrogen Fluoride Chemical Fact Sheet* (June 11, 2026), https://www.cdc.gov/chemical-emergencies/chemical-fact-sheets/hydrogen-fluoride.html.

78. Long-term exposure to low levels of HF can irritate people's nose, throat, and bronchi and cause congestion.

79. Peer-reviewed scientific studies also have shown that fluorides can cause severe damage to plants, including by inhibiting photosynthesis and causing reproductive failure. An accumulative poison, fluorides build up in plant tissues over time and cannot be easily excreted or broken down. Such damage to plants appears in various ways, including burned leaf tips, drying, browning and yellowing foliage, and dieback of plant leaf edges and tips. Excessive systemic exposure to fluorides, including through ingesting contaminated plants, can damage bones, including teeth, in both humans and animals.

80. Harms to human health and the environment can be alleviated by reducing exposure to fluoride pollution and, here, by reducing TF emissions from the Mt. Holly Smelter.

**Key Emissions Sources**

81. The Mt. Holly Smelter emits $SO_2$, PM (including $PM_{10}$ and $PM_{2.5}$), and TF from the locations listed in the table below, each of which is relevant to claims in this Complaint.

**Table 1: Key Emission Sources at the Mt. Holly Smelter**

| Emissions Source | Unit ID | Equipment ID | Control Device | Source ID |
|---|---|---|---|---|
| **Baked Carbon Plant** | | | | |
| Anode Bake Furnace | 02 | 53001 | 53001 | 01 |
| **Potlines** | | | | |
| Potline #1 Ridge Vent East | 04 | 40101 | n/a | 02A |
| Potline #1 Ridge Vent West | 04 | 40102 | n/a | 03A |
| Potline #1 Scrubber Stack 161E | 04 | 70010A | 53002 | 02 |
| Potline #1 Scrubber Stack 161W | 04 | 70010B | 53003 | 03 |
| Potline #2 Ridge Vent West | 04 | 40104 | 53004 | 05A |
| Potline #2 West Scrubber Stack 162W | 04 | 70010D | 53005 | 05 |
| ***Combined Emission Sources*** | | | | |
| Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack) | 04 | 40101 & 70010A | 53002 | 02 & 02A |
| Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack) | 04 | 40402 & 70010B | 53003 | 03 & 03A |
| Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack) | 04 | 40104 & 70010D | 53005 | 05 & 05A |

## PLAINTIFF'S MEMBERS' INJURIES

82. Sierra Club members live, work, recreate, own property, study, and pursue spiritual practices in the areas at the greatest risk from the Mt. Holly Smelter's ongoing and unlawful air pollution. The polluted air, which has been substantially degraded by the Smelter's illegal emissions, injures and threatens to injure members' health, recreational, environmental, spiritual, economic, educational, and aesthetic interests.

83. Sierra Club members have reason to conclude that the Mt. Holly Smelter has harmed and is continuing to harm their health, well-being, and pursuits. Unless the relief requested herein is granted, the Smelter's violations of the Clean Air Act will continue to injure Sierra Club members where they live and recreate.

84. Several Sierra Club members reside in Goose Creek, South Carolina, within a mile or two of the Smelter. They have suffered and continue to suffer from respiratory problems consistent with exposure to $SO_2$, PM (including $PM_{10}$ and $PM_{2.5}$), and fluoride emissions. White dust, a type of particulate pollution from the Mt. Holly Smelter, also has periodically coated their patios, lawns, cars, homes, and neighborhoods.

85. For example, Sierra Club Member A lives about a mile southwest from the smelter and drives past the plant almost every day. She moved to Goose Creek in March 2023.

86. Starting around August 2023, Member A began experiencing chest tightness and respiratory problems such as congestion and a persistent, almost chronic cough. While Member A has seasonal ragweed allergies, these new symptoms were notably different than Member A's typical allergy symptoms, which often include itchy eyes for which eyedrops and over-the-counter antihistamines, typically provide relief. During this period, Member A's eyes felt abnormally gritty and irritated, and neither eyedrops nor antihistamines helped. Member A's

respiratory irritation and cough also persisted beyond the ragweed allergy season. Member A is reasonably concerned that the symptoms, which started shortly after moving to the area, are related to air pollution from the Mt. Holly Smelter.

87. Around that same time, late summer 2023, Member A noticed white dust in the neighborhood that looked like talcum powder. The dust coated Member A's cars, patio, and grass. Member A would clean the patio, but it would be coated in dust again the next day. Some days the dust coming from the Smelter was heavier than others, and sometimes the dust was so heavy it looked like it was snowing.

88. In April 2026, Member A again saw white dust in the neighborhood and on her property; the dust was noticeably different from the yellow dust she expected during pollen season. Member A's eyes again became irritated, and she developed a persistent cough. As before, the symptoms felt different than typical allergy symptoms, including a particular "heaviness" when breathing, and they persisted despite her normal allergy treatments.

89. Member A is concerned that the Mt. Holly Smelter's ongoing air pollution, both visible and invisible, is harming her and her family's health and quality of life. She worries that pollution from the Smelter is causing chronic lung damage.

90. Member A and her partner both work from home and consistently take two to three walks a day around the neighborhood. After these walks during 2023,

they would develop irritated eyes and airways and a cough. Because of Member A's reasonable concern that the symptoms were related to the dust from the Mt. Holly Smelter, Member A started to limit the number of walks and sometimes stopped going on walks altogether. To protect their health, Member A and her partner joined a gym instead of taking walks or have sometimes just stayed at home.

91. Member A believes that the relief sought in this case, including an order requiring compliance with permitted limits, continuous monitoring, and improvements to the plant's operations, would help relieve Member A's symptoms and those of her family, protect their health, and improve their quality of life. Member A has already tried to work with the State and local officials to resolve her concerns about the Smelter's persistent air pollution problems to no avail.

92. Member B lives about two miles southwest of the entrance to the Mt. Holly Smelter. Though retired now, Member B was previously a respiratory therapist and has worked on air pollution issues.

93. Member B has asthma and often develops bronchitis following basic illnesses such as the common cold. One such instance was in late September 2023, when massive baghouse failures at the Smelter caused white dust to rain down on Member B's neighborhood and the surrounding areas, including on Member B's dark green car. Around that time, Member B developed significant nasal congestion and a productive cough. For fresh air, Member B had been leaving the home's

windows open, but she stopped doing so around that time given her reasonable concerns about the level of air pollution outside. During that time, Member B was treated for bronchitis. Member B noticed that the PM problems continued into late October 2023.

94. Since fall 2023, when white dust coated residents' cars and properties, Member B has noticed that she generally feels sicker day-to-day and coughs more often.

95. Given her struggles with asthma, Member B is concerned about the Mt. Holly Smelter's illegal air pollution, both visible and invisible, and the ongoing threats the pollution poses to her health and quality of life. During the white dust emissions in fall 2023, for example, Member B stayed inside more and refrained from taking care of the home's outdoor landscaping because the white dust was everywhere. On bad air days, which continue to persist, going outside and opening windows often makes Member B feel sick.

96. Member B believes that the relief sought in this Complaint, including requiring Century Aluminum to comply with permitted limits, to improve operations and to install continuous emission monitoring equipment at the Mt. Holly Smelter, would help protect Member B's health and well-being by improving air quality where she lives. Like Member A, Member B has urged the State to address the Smelter's ongoing problems without success.

97. Member C lives about a mile from the entrance to the Mt. Holly Smelter. She has lived in Goose Creek continuously since June 2011.

98. In 2020, Member C was diagnosed with asthma after testing in 2019 showed a significant decrease in her lung capacity that requires daily asthma treatments. While Member C suffered from environmental allergies for many years, her more recent asthma symptoms have progressively worsened and are taking a much larger toll on her health and quality of life. Testing in fall 2026 showed that Member C continues to suffer from severely constricted airways.

99. Member C is concerned that her more recent respiratory problems have been exacerbated by air pollution from the Mt. Holly Smelter. During 2023, Member C noticed more upper and lower respiratory symptoms than usual, including coughing fits, a tickling in the throat, sore throat and hoarseness, and burning and itchy eyes. Member C's respiratory symptoms on certain days were qualitatively different than on days when she just experienced allergy issues. In September 2023, Member C noticed white dust from the Mt. Holly Smelter around her home, including in the bedroom, on top of her trash can and car (even though she keeps her car in the garage), and on plants and bushes.

100. Member C always thought it was odd that some days her asthma and respiratory symptoms were worse than other days. The white dust releases in fall

2023 helped her piece things together, and she became very concerned that the smelter's air pollution is exacerbating her asthma and other respiratory issues.

101. After the fall 2023 releases, Member C noticed that her respiratory problems improved significantly when she visited her mother, who lives about 15 miles away. She also noticed that the air smelled significantly "better" away from home, not the chemical smell that occasionally pervades her Goose Creek neighborhood.

102. Member C's respiratory problems related to air pollution from the Smelter continued into late January 2024, when she again found herself coughing badly and suffering from throat irritation. She has experienced such respiratory problems even when she has not seen white dust in the neighborhood. Her asthma has worsened and her wheezing has become more frequent.

103. Because of Member C's reasonable concerns about the Mt. Holly Smelter's ongoing and unlawful air pollution, Member C often limits time outside, including outdoor activities that Member C would otherwise enjoy such as taking in the greenery around Member C's home. Member C also leaves Goose Creek more often to stay with her mother, when her respiratory symptoms are severe.

104. Member C believes that the relief sought in this Complaint, including an order requiring compliance with permitted limits and improved operations, will

improve her health and quality of life. Like other members, Member C has asked the State to step in without success.

105. In addition to Sierra Club members' reasonable health concerns, members also have experienced hazy views in places where they enjoy recreating, such as Cape Romain National Wildlife Refuge. The hazy skies have detracted from their enjoyment of such areas, including their ability to observe distant vistas, birds, sea turtles, and the pristine flora and fauna.

106. The relief requested in this Complaint would relieve each of the above injuries to Sierra Club members.

107. Each of the above injuries suffered by Sierra Club members is germane to Sierra Club's purpose, which includes protecting communities, wild places, and the natural and human environment from unlawful air pollution.

108. Neither the specific claims nor the requested relief require that individual Sierra Club members participate directly as plaintiffs in this lawsuit. The claims target the Mt. Holly Smelter's ongoing operations, and the relief seeks to improve those operations by reducing air pollution that harms Sierra Club members.

## LEGAL BACKGROUND

109. Congress enacted the Clean Air Act as a broad remedial statute "to protect and enhance the quality of the Nation's air resources so as to promote the

public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

**Criteria Pollutants & SIPs**

110. The Clean Air Act requires EPA to regulate emissions of air pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1)(A). These are referred to as "criteria pollutants" and include $PM_{10}$, $PM_{2.5}$, and $SO_2$. 40 C.F.R. §§ 50.4-50.21. Emissions of many other pollutants not designated as "criteria pollutants" are also regulated under the Clean Air Act. *See, e.g.*, 42 U.S.C. § 7412 (HAPs, discussed below).

111. EPA sets National Ambient Air Quality Standards (NAAQS) to limit concentrations of criteria pollutants to levels "requisite to protect the public health" and "to protect public welfare." *Id.* § 7409(b)(1)-(2).

112. Each state, in turn, must develop a State Implementation Plan (SIP) setting forth, among other things, how the NAAQS will be achieved and maintained within the state. *Id.* § 7410(a)(1). To that end, each state, with EPA's concurrence, must designate those areas within their boundaries as an "attainment" area where the air quality meets the air quality standard for each criteria pollutant, as "unclassifiable" due to insufficient data, or as a "nonattainment" area where air

quality does not meet the applicable standard. *Id.* § 7407(d)(1)(A). EPA promulgates these designations in 40 C.F.R. Part 81, Subpart C.

113. States must then adopt and submit to EPA for approval an implementation plan for the attainment and maintenance of the air quality standards. *See generally id.* §§ 7410, 7470-7492 (Part C), 7501-7515 (Part D). Among other requirements, the plan must include enforceable emission limitations and other control measures to meet the applicable requirements of the Clean Air Act. *See id.* § 7410(2)(A). After such provisions are approved by EPA, these provisions constitute a state's "applicable implementation plan," within the meaning of the Clean Air Act. *Id.* § 7602(q); *see also id.* § 7413(b)(1). These provisions are considered the SIP, which is enforceable by citizens. *Id.* § 7604(a)(1)(A), (f)(3)-(4).

114. EPA has approved a SIP for South Carolina. 40 C.F.R. §§ 52.2120-52.2141.

115. The Clean Air Act requires that each SIP include a permit program to regulate "the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved . . . ." 42 U.S.C. § 7410(a)(2)(C).

116. South Carolina's SIP includes permit requirements for the construction and operation of sources of air contaminants, in addition to other more specific requirements applicable to construction and operation of certain sources of air

contaminants in other regulations. *See* S.C. Reg. 61-62.1, § II; 73 Fed. Reg. 31,369 (June 2, 2008); 87 Fed. Reg. 62,034 (Oct. 13, 2022).

**Prevention of Significant Deterioration**

117. Congress amended the Clean Air Act in 1977 to codify the Prevention of Significant Deterioration (PSD) program in Part C of the Clean Air Act. 42 U.S.C. §§ 7470-7492. The PSD program requires states to adopt emission limitations and other measures as necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable pursuant to § 7407. *Id.* § 7471.

118. The PSD program applies here because the Mt. Holly Smelter is in Berkeley County, South Carolina, which is designated as an "unclassifiable/attainment" area for all federal ambient air quality standards.

119. The purposes of the PSD program include protecting public health and welfare from adverse effects from air pollution that may be anticipated to occur in areas that are attaining the NAAQS, "to preserve, protect, and enhance the air quality in" national parks, wilderness areas, etc. (called "Class I areas"), to "insure that economic growth will occur in a manner consistent with preservation of clean air resources," and to assure that any increase in air pollution, and a state's decision to permit it, "is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process." *Id.* § 7470(1), (2), (3), (5).

120. The PSD program therefore prohibits the construction or modification, and subsequent operation of, a "major emitting facility," unless a PSD permit has been issued for such proposed facility. *Id.* § 7475(a)(1).

121. The PSD program includes several requirements that must be met in order for a PSD permit to be issued, which include, but are not limited to, that the new or modified facility must be subject to the best available control technology (BACT) and that it must demonstrate that its emissions will neither cause violations of NAAQS nor adversely impact visibility or other air quality related values in Class I national parks and national wilderness areas. *Id.* § 7475(a)(3)-(5). Further, before issuance, each proposed PSD permit must be subject to the opportunity for the public to submit written or oral comments on "the air quality impacts of each source, alternatives thereto, control technology requirements, and other appropriate considerations." *Id.* § 7475(a)(2).

122. South Carolina promulgated PSD program implementation regulations, which EPA approved into South Carolina's SIP. 40 C.F.R. § 52.2131. South Carolina's PSD regulations are codified in a SIP regulation called Standard No. 7. *See* S.C. Reg. 61-62.5, Standard No. 7; 86 Fed. Reg. 59,646 (Oct. 28, 2021).

123. To implement the PSD program, Standard No. 7 prohibits construction of a "new major stationary source or major modification . . . without a permit that

states that the major stationary source or major modification will meet [PSD] requirements." S.C. Reg. 61-62.5, Standard No. 7, § (A)(2)(c).

124. Standard No. 7 § (B)(30)(a) defines "major modification" as

> any physical change in or change in the method of operation of a major stationary source that would result in a significant emissions increase (as defined in paragraph (B)(50) [of Standard No. 7, S.C. Regulation 61-62.5]) of a regulated [NSR] pollutant increase (as defined in paragraph (B)(44) [of Standard No. 7, S.C. Regulation 61-62.5]); and a significant net emissions increase of that pollutant from the major stationary source.

125. Standard No. 7 § (A)(2)(d)(i) also states that:

> a project is a major modification for a regulated New Source Review (NSR) pollutant if it causes two types of emission increases – a significant emissions increase (as defined in paragraph (B)(50) [of Standard No. 7, S.C. Regulation 61-62.5]) and a significant net emissions increase (as defined in paragraphs (B)(34) and (B)(49) [of Standard No. 7, S.C. Regulation 61-62.5]).

126. In addition, Standard No. 7 § (A)(2)(d)(ii) and (iii) specifies the following procedure for calculating (before beginning actual construction) whether a significant emission increase will occur for projects that only involve existing emission units:

> A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (B)(41) [of Standard No. 7, S.C. Regulation 61-62.5]) and the baseline actual emissions (as defined in paragraphs (B)(4)(a) and (B)(4)(b) [of Standard No. 7, S.C. Regulation 61-62.5]), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (B)(49) [of Standard No. 7, S.C. Regulation 61-62.5]).

127. Standard No. 7 § (B)(A)(2)(d)(ii) also provides that

regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase in a criteria pollutant.

128. Standard No. 7 § (B)(50) defines "significant emissions increase . . . for a regulated NSR pollutant" to be "an increase in emissions that is significant as defined in paragraph (B)(49) for that pollutant."

129. Section (B)(49)(a), in turn, defines "significant" in reference to a net emissions increase as a rate of emissions that would equal or exceed 25 tons per year of PM, 15 tons per year of $PM_{10}$ emissions, and 10 tons per year of direct $PM_{2.5}$ emissions. Section (B)(49)(a) also defines "significant" in reference to a net emissions increase as a rate of emissions that would equal or exceed 40 tons per year for $SO_2$ and 40 tons per year of $SO_2$ as a precursor to $PM_{2.5}$. *Id.* § (B)(49)(a).

130. Standard No. 7 § (B)(50) defines "significant emissions increase . . . for a regulated NSR pollutant" to be "an increase in emissions that is significant as defined in paragraph (B)(49) for that pollutant."

131. The definition of "regulated NSR pollutant" identifies, among other pollutants, any pollutant for which a NAAQS has been promulgated including (1) condensable particulate matter which "shall be accounted for in applicability determinations and in establishing emissions limitations for $PM_{2.5}$ and $PM_{10}$ in PSD

permits," and (2) $SO_2$ as "a precursor to $PM_{2.5}$ in all attainment and unclassifiable areas." *Id.* §§ (B)(44)(a)(i) & (ii)(2).

132. PSD permits must impose emission limits that reflect BACT. BACT emission limits must be based on the maximum degree of emissions reduction achievable through the use of stringent pollution controls and/or production processes or available methods, systems, and techniques on an ongoing basis. 42 U.S.C. §§ 7475(a)(4) (prohibiting construction of a major emitting facility unless it is subject to BACT, among other requirements) & 7479(3) (defining BACT); *see* S.C. Reg. 61-62.5, Standard No. 7 §§ (A)(2)(b) & (J)(3) (requiring major modifications to apply BACT), (B)(8) (defining BACT).

133. For "each NSR pollutant" for which a major modification "would result in a significant net emissions increase at the source," BACT must be applied. S.C. Reg. 61-62.5, Standard No. 7 § (J)(3). "This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of the physical change or change in the method of operation of the unit." *Id.*

134. Additionally, Standard No. 7 § (R)(4) provides that "[a]t such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification to otherwise emit a pollutant," then all PSD requirements, including BACT, "apply to

the source or modification as though construction had not yet commenced." *Id.* § (R)(4); *see also* 40 C.F.R. § 51.21(r)(4).

**Hazardous Air Pollutants**

135. The Clean Air Act also establishes a technology-based program to reduce stationary source emissions of HAPs from new and existing sources, at § 112. 42 U.S.C. § 7412.

136. Section 112(d) requires EPA to promulgate regulations to reflect the maximum degree of reduction in emissions of HAPs that is achievable taking into consideration the cost of achieving the emission reduction, any non-air quality health and environmental impacts, and energy requirements. *Id.* § 7412(d). This level of control is commonly referred to as the maximum achievable control technology (MACT). *Id.* § 7412(d)(2). The goal of MACT standards is to apply such control technology to reduce emissions and thereby reduce the hazard of HAPs emitted from stationary sources.

137. Section 112(c) requires EPA to list each category of major and area sources, as appropriate, emitting one or more of the HAPs listed in section 112(b) of the Act. *Id.* § 7412(c).

138. The term "major source" is defined by the Act to mean any stationary source "that emits or has the potential to emit, considering controls, in the aggregate, 10 tons per year or more of any [HAP] or 25 tons per year or more of any

combination of [HAPs]." *Id.* § 7412(a)(1). The Mt. Holly Smelter is a major source of HAPs.

139. EPA established an initial list of 174 major source categories under § 112(c), and primary aluminum production is one such category. 57 Fed. Reg. 31,576, 31,591 (July 16, 1992).

140. Thus, pursuant to § 7412(b) and (c), EPA issued regulations for primary aluminum production: 40 C.F.R. Part 63, Subpart LL (MACT standards).

141. The MACT standards apply to, among other emissions units, each new and existing potline and each anode bake furnace associated with primary aluminum production plants at a major source. 40 C.F.R. § 63.840(a).

142. Under the MACT standards, a "potline" is a "single, discrete group of electrolytic reduction cells electrically connected in series, in which alumina is reduced to form aluminum." *Id.* § 63.842.

143. A "[c]enter-worked prebake (CWPB) process" is "a method of primary aluminum reduction using the prebake process in which the alumina feed is added down the center of the reduction cell." *Id.*

144. The Mt. Holly Smelter operates "CWPB1" potlines. *See id.* § 63.842 (CWPB1 potlines defined as all existing lines not otherwise named as CWPB2 or CWPB3, and the Mt. Holly Smelter is not named as such).

145. The MACT regulations have fluoride standards for potlines, which prohibit TF emissions in excess of 0.95 kg/Mg (1.9 lb/ton) of aluminum produced for each CWPB1 potline. *Id.* § 63.843(a)(1)(i).

146. The MACT standards also apply to anode bake furnaces, defined as "an oven in which the formed green anodes are baked for use in a prebake process." *Id.* § 63.842. For anode bake furnaces at existing sources, owners or operators may not emit PM in excess of 0.10 kg/Mg (0.20 lb/ton) of green anode. *Id.* § 63.843(c)(3).

147. MACT standards are enforceable by citizens. *See* 42 U.S.C. § 7604(a)(1)(A), (f)(1), (3), (4).

**Title V Operating Permits**

148. Finally, the Clean Air Act establishes an operating permit program for certain sources, including major sources, to ensure that permittees comply with all "applicable requirements" of the Clean Air Act. *See* 42 U.S.C. §§ 7661-7661f.

149. Title V permits are issued by states, *id.* § 7661a(d), once EPA has approved a state program, *id.* § 7661a(d).

150. In 1995, EPA granted full approval of South Carolina's Title V operating permit program. *See* 95 Fed. Reg. 15574 (June 26, 1995); 40 C.F.R. Part 70, Appendix A. S.C. Reg. 61-62.70, §§ 70.1-70.9.

151. Title V permits in South Carolina are also known as "Part 70 permits." *See* S.C. Reg. 61-62.70, §§ 70.2(t), (v), 70.3(a).

152. The Clean Air Act and the South Carolina Title V operating permit program make it unlawful for any person to violate any requirement of a Title V permit or to operate a major source in violation of a Title V permit. 42 U.S.C. § 7661a(a); S.C. Reg. 61-62.70, § 70.7(b) ("No Part 70 source may operate after the time that it is required to submit a timely and complete application, except in compliance with a permit issued under a Part 70 program.").

153. Additionally, where a source is required to have a PSD permit, it must obtain a Title V permit revision. Such sources

> shall file a complete application to obtain the Part 70 [Title V] permit or permit revision within 12 months after commencing operation or on or before such earlier date as the permitting authority may establish. Where an existing Part 70 permit would prohibit such construction or change in operation, the source must obtain a permit revision before commencing operation.

S.C. Reg. 61-62.70, § 70.5(a)(1)(ii).

154. The Mt. Holly Smelter's Title V permit (1) prohibits noncompliance with any applicable law, regulation, or standard, 2021 Title V Permit TV-0420-0015, Condition M.24; (2) prohibits commencing construction after the effective date of these regulations without applying for and receiving approval under the State's permitting regulations, *see id.* at Condition M.25; and (3) prohibits noncompliance with any conditions of the Title V permit, *see id.* at Condition M.9.

155. Standards, limits, or schedules in Title V and PSD permits are enforceable by citizens. *See* 42 U.S.C. § 7604(a)(1)(A), (f)(1), (3), (4).

## RELEVANT PERMITTING HISTORY & EMISSION LIMITS

156. The Mt. Holly Smelter began operation in 1979 and operates under Part 70 permit TV-0420-0015, effective July 1, 2021, and various construction permits.

157. Most of the emission limits at issue in this Complaint have applied to the Mt. Holly Smelter since its initial permits were issued in 1979 (e.g., the PM limits applicable to the potline roof vents) or since at least 1995 (e.g., the TF limits applicable to the potlines). The Mt. Holly Smelter has been subject to different limits on the sulfur content of the petroleum coke used in carbon anode formation. Since 2002, the Smelter has been subject to a 2.22% petroleum coke sulfur limit. Some of the Smelter's relevant permitting history follows.

158. On February 22, 1978, SCDES (which at the time was SCDHEC)[1] issued Construction Permits P/C-08-115 and P/C/-08-116 to Alumax, Inc. (a predecessor to Century Aluminum),[2] which allowed the Mt. Holly Smelter to be built. The 1978 construction permits included limitations on PM emissions from the

---

[1] In 2024, the South Carolina Department of Health & Environmental Control (SCDHEC) became two separate agencies: the SCDES and South Carolina Department of Public Health (DPH). Issues related to air pollution regulation went to SCDES. Reference will be made to SCDES instead of SCDHEC for ease of the reader regardless of the year any state agency action was undertaken. If the state agency action occurred before July 1, 2024, the state agency that acted is actually SCDHEC.

[2] Century Aluminum Co. acquired Alumax of South Carolina/Alcoa-Mt. Holly in 2015.

potroom roof vents, the sulfur content of the petroleum coke and tar pitch used in forming carbon anodes, and the $SO_2$ emissions emitted from the potroom roof vents and the dry alumina scrubbers.

159. On August 30, 1995, SCDES issued PSD Construction Permit 0420-0015-CH to Alumax of South Carolina. The 1995 construction permit included, among other requirements, limitations on PM emissions for each potroom group roof vents and on each potroom group dry scrubber, revised sulfur content limitations, and TF limits.

160. On November 19, 2002, SCDES issued PSD Construction Permit 0420-0015-CR to Alcoa Mt. Holly, operating as Alumax of South Carolina (2002 Construction Permit). The 2002 Construction Permit was issued to allow the Mt. Holly plant to increase aluminum production at the Mt. Holly Smelter. Because SCDES found was a PSD major modification for PM, $PM_{10}$, fluorides, and several other pollutants, the permit imposed enforceable limits to allow the modification to avoid PSD review.

161. Specifically, the 2002 Construction Permit included, among other requirements, two new lower sulfur content limits for materials used in carbon anode formation: a 2.22% sulfur content limit on petroleum coke (monthly average by weight) and a 0.85% sulfur content limit on tar pitch (monthly average by weight). In addition, the 2002 Construction Permit included BACT emission limits on PM

and TF, as well as other pollutants, pursuant to S.C. Regulation 61-62.5, Standard No. 7 (PSD). These limits are listed in Tables 2 and 3 below.

162. On January 30, 2003, SCDES issued the revised Part 70 Air Quality Permit TV-0420-0015 that incorporated applicable limits, including the 2002 Construction Permit with the PM, TF, and sulfur content limits (2003 Revised Title V Permit).

163. On January 3, 2008, SCDES issued Construction Permit 0420-0015-CU to Alumax of South Carolina, Inc./Alcoa-Mt. Holly (2008 Construction Permit). The sulfur content limits on the petroleum coke and the tar pitch used to form anodes remained unchanged from the 2002 Construction Permit.

164. On December 9, 2016, SCDES issued Construction Permit 0420-0015-CW to Century Aluminum of South Carolina, Inc. (2016 Construction Permit). This permit allowed the use of petroleum coke with up to 3.0% sulfur content (monthly average), but also decreased the facility's maximum permitted potline aluminum production capacity from 256,150 tons per year to 128,075 tons per year (reflective of a one potline/3.0% sulfur coke operating scenario).

165. On June 23, 2021, SCDES renewed the Title V Permit TV-0420-0015 to Century Aluminum, effective July 1, 2021 (2021 Title V Permit). The 2021 Title V Permit continued to incorporate the PM, TF, and petroleum coke and tar pitch

sulfur content emission limits described in the 2002 and 2008 Construction Permits (and in Tables 2 and 3 below).

166. On January 12, 2023, SCDES issued PSD Construction Permit No. 0420-0015-CY (2023 Invalid PSD Permit), which purported to revise the PM BACT emission limits for the potlines. Because the public notice for this permit was deficient (as the EPA likewise found, see below), the 2023 PSD Permit is invalid.

167. On April 13, 2023, SCDES issued a Title V permit minor permit modification, TV-0420-0015 v1.1. At Century Aluminum's request, SCDES improperly attempted to amend Mt. Holly's 2021 Title V Permit to revise the petroleum coke sulfur content limit using minor permit modification procedures (2023 Invalid Title V Permit). The revision would have allowed the Mt. Holly Smelter to use blended coke with 3.0% by weight monthly average sulfur content. Plaintiff petitioned EPA to object to this change. On November 2, 2023, EPA objected to the SCDES's attempt to change the limit, concluding that the sulfur content limit was not eligible for processing as a Title V minor permit modification under federal and state Operating Permit Program regulations. Century Aluminum of South Carolina, Inc., EPA Pet. No. IV-2023-09, at 11-16 (Nov. 2, 2023).

168. At the same time, SCDES also attempted to administratively amend Mt. Holly's 2021 Title V Permit to incorporate the 2023 Invalid PSD Permit revising the PM BACT limits. In its November 2, 2023 order, EPA also objected to this action,

concluding that the 2023 PSD Permit changes were not eligible to be incorporated into the Title V permit via an administrative permit amendment because the public notice for the 2023 PSD Permit did not satisfy the relevant Part 70 requirements. *Id.* at 19-22.

169. Thus, the 2023 Title V Permit revision and 2023 PSD Permit are both invalid.

170. In March 2025, SCDES and Century Aluminum entered a private administrative consent agreement covering some (but not all) of the violations at issue here. SCDES ordered a civil penalty and required, among other things, compliance with a Potline Dry Scrubber Daily Inspection Checklist and a corrective action plan. But the agreement did not remedy fundamental problems at issue in this Complaint, and the Smelter continues to violate its permits and the Act.

**<u>Particulate Matter Limits</u>**

171. The Mt. Holly Smelter is subject to several PM limits relevant to claims in this Complaint. They are identified in the table below.

172. Specifically, at each of the following sources, the Mt. Holly Smelter may not emit PM at rate that exceeds the identified limit:

**Table 2: Relevant PM Limits**

| Emission Source | PM Limit | Permit(s) and/or Regulations |
|---|---|---|
| *Potline #1* | | |

| | | |
|---|---|---|
| Potline #1 Ridge Vent East | 18.15 lb/hr | 2002 Construction Permit (Section II.A.); 2003 Revised Title V Permit (Condition 5.D. Table 5.9); 2021 Title V Permit (Condition C.23) |
| Potline #1 Ridge Vent West | 18.15 lb/hr | 2002 Construction Permit (Section II.A.); 2003 Revised Title V Permit (Condition 5.D. Table 5.9); 2021 Title V Permit (Condition C.23) |
| Potline #1 East Scrubber Stack 161E | 1.5 lb/hr | 2002 Construction Permit (Section II.A.); 2003 Revised Title V Permit (Condition 5.D. Table 5.9); 2021 Title V Permit (Condition C.24) |
| Potline #1 West Scrubber Stack 161W | 1.5 lb/hr | 2002 Construction Permit (Section II.A.); 2003 Revised Title V Permit (Condition 5.D. Table 5.9); 2021 Title V Permit (Condition C.24) |
| Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack) | 19.65 lb/hr | 2002 Construction Permit (Condition II.D.18); 2003 Revised Title V Permit (Condition 5.E.11) |
| Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack) | 19.65 lb/hr | 2002 Construction Permit (Condition II.D.18); 2003 Revised Title V Permit (Condition 5.E.11). |
| *Potline #2* | | |
| Potline #2 Ridge Vent West | 18.15 lb/hr | 2002 Construction Permit (Section II.A); 2021 Title V Permit (Condition C.23) |
| Potline #2 West Scrubber Stack 162W | 1.5 lb/hr | 2002 Construction Permit (Section II.A.); 2021 Title V Permit (Condition C.24) |
| Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack) | 19.65 lb/hr | 2002 Construction Permit (Condition II.D.18); 2003 Revised Title V Permit (Condition 5.E.11); 2021 Title V Permit (Condition C.24) |
| *Anode Bake Furnace* | | |
| Anode Bake Oven | 4.91 lb/hr | 2002 Construction Permit (Section II.A.); 2003 Revised Title V Permit |

| | | |
|---|---|---|
| | | (Condition 5.D. Table 5.9); 2021 Title V Permit (Condition C.16) |
| Anode Bake Oven | 0.20 lb/ton of green anodes processed | 40 C.F.R. § 63.843(c)(3); 2021 Title V Permit (Condition E.4) |

173. To the extent that the provisions of the 2023 (Invalid) PSD Permit and the 2023 (Invalid) Title V Permit are deemed valid, as of April 13, 2023, the Mt. Holly Smelter may not emit particulate matter at more than 28.73 lb/hr at any of the Potroom Groups. *See* 2023 Invalid PSD Permit (Condition 5); 2023 Invalid Title V Permit Revision (Condition C.23).

**<u>Total Fluorides Limits</u>**

174. The Mt. Holly Smelter is subject to several TF limits relevant to claims in this Complaint.

**Table 3: Relevant TF Limits**

| **Emission Source** | **TF Limit** | **Permit(s) and/or Regulation** |
|---|---|---|
| *Potline #1* | | |
| Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack) | 1.9 lb/ton of aluminum produced | 40 C.F.R. § 63.843(a)(1)(i); 2002 Construction Permit (Condition II.D.11); 2021 Title V Permit (Conditions C.31, E.4); 2023 Invalid Title V Permit (Conditions C.30, E.4) |

| | | |
|---|---|---|
| Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack) | 1.9 lb/ton of aluminum produced | 40 C.F.R. § 63.843(a)(1)(i); 2002 Construction Permit (Condition II.D.11); 2021 Title V Permit (Conditions C.31, E.4); 2023 Invalid Title V Permit (Conditions C.30, E.4) |
| Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack) | 1.34 lb/ton aluminum produced (single month average) | 2002 Construction Permit (Conditions II.D.11 & D.21); 2003 Title V permit (Condition D, Table 5.9); 2021 Title V Permit (Condition C.28); 2023 Invalid Permit (Condition C.27) |
| *Potline #2* | | |
| Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack) | 1.9 lb/ton of aluminum produced | 40 C.F.R. § 63.843(a)(1)(i); 2002 Construction Permit (Condition II.D.11); 2021 Title V Permit (Conditions C.31, E.4); 2023 Invalid Title V Permit (Conditions C.30, E.4) |
| *Plantwide Average* | | |
| Potlines, Plantwide average | 1.02 lb/ton aluminum produced (12-month rolling average) | 2002 Construction Permit (Conditions II.A. and II.D.11, D.21); 2021 Title V Permit (Condition C.28); 2023 Invalid Permit (Condition C.27) |
| Potlines, Plantwide average | 1.34 lb/ton aluminum produced (single-month average) | 2002 Construction Permit (Condition II.D.11 & D.21); 2021 Title V Permit (Condition C.28); 2023 Invalid Permit (Condition C.27) |

**<u>Sulfur Content Limits</u>**

175. Century Mt. Holly's 2002 Construction Permit (Condition II. D.9), 2008 Construction Permit (Conditions II.A. and II.D.11), and 2021 Title V Permit

(Condition C.15) all require that "[t]he sulfur content of the coke used in forming the anodes shall not exceed 2.22% by weight based upon a monthly average."

## CLEAN AIR ACT ENFORCEMENT

176. The Clean Air Act empowers any person to enforce violations of emission standards or limitations. 42 U.S.C. § 7604(a)(1). Emission standards or limitations are defined as including an "emission limitation, standard of performance or emission standard," "any condition or requirement of a [PSD] permit," and "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations." *Id.* § 7604(f)(1), (3), & (4).

177. Additionally, the Act provides a separate cause of action for any person against any other person who constructs any new or modifies any existing major facility without the required permits. *Id.* § 7604(a)(3).

178. Plaintiff Sierra Club and Defendant Century Aluminum are "persons" within the meaning of the Clean Air Act. *Id.* § 7602(e).

179. This Court is authorized to order injunctive relief and penalties. 28 U.S.C. § 2461; 31 U.S.C. § 3701; 42 U.S.C. §§ 7413(b), 7604(a); 40 C.F.R. Part 19.

180. Penalties are paid to the United States Treasury, except that the Court may authorize that some monies be paid into a beneficial mitigation project fund used to enhance the public health or environment. 42 U.S.C. § 7604(g)(2).

## CLAIMS FOR RELIEF

### Sierra Club's First Claim for Relief

### Violations of Particulate Emission Limits

181. Sierra Club realleges and incorporates all preceding paragraphs by reference.

182. With respect to all paragraphs in this First Claim for Relief, Century Aluminum has been and is in violation of the identified emissions standards or limitations for every hour, day, and month between the approximate start dates and end dates of the emissions violations identified.

*Potline #1 Ridge Vent East*

183. Each hour from November 9, 2019 through October 5, 2020, Century Aluminum emitted PM at a rate that exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent East. In each of those hours, Century Aluminum violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

184. Each hour from March 2, 2021 through June 30, 2021, Century Aluminum emitted particulate matter at a rate that exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent East. In each of those hours, Century Aluminum violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

185. Each hour beginning July 2021 through November 2021, Century Aluminum emitted PM at a rate that exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent East. In each of those hours, Century Aluminum violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

186. Each hour beginning October 2022 through March 2024, Century Aluminum emitted PM at a rate that exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent East. In each of those hours, Century Aluminum violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

187. Each hour beginning October 2024 to the present, Century Aluminum has emitted PM at a rate that has exceeded 18.15 lb/hr from the Mt. Holly Smelter's

Potline #1 Ridge Vent East. In each of those hours, Century Aluminum has violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

*Potline #1 Ridge Vent West*

188. Each hour from February 3, 2020 through October 5, 2020, Century Aluminum emitted PM at a rate that exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent West. In each of those hours, Century Aluminum violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

189. Each hour beginning November 2021 through December 2022, Century Aluminum emitted PM at a rate that exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent West. In each of those hours, Century Aluminum violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

190. Each hour beginning March 2023 through March 2024, Century Aluminum emitted PM at a rate that exceeded18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent West. In each of those hours, Century Aluminum

violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

191. Each hour beginning October 2024 through the present, Century Aluminum has emitted PM at a rate that has exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #1 Ridge Vent West. In each of those hours, Century Aluminum has violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.23).

*Potline #1 Scrubber Stack 161E*

192. Each hour from November 9, 2019 through April 28, 2021, Century Aluminum emitted PM at a rate that exceeded 1.5 lb/hr from the Mt. Holly Smelter's Potline #1 Scrubber Stack 161E. In each of those hours, Century Aluminum violated the PM emission limit of 1.5 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.24).

*Potline #1 Scrubber Stack 161W*

193. Each hour from November 9, 2019 through March 2, 2020, Century Aluminum emitted PM at a rate that exceeded 1.5 lb/hr from the Mt. Holly Smelter's Potline #1 Scrubber Stack 161W. In each of those hours, Century Aluminum

violated the PM emission limit of 1.5 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.24).

194. Each hour from February 2023 through February 2024, Century Aluminum emitted PM at a rate that exceeded 1.5 lb/hr from the Mt. Holly Smelter's Potline #1 Scrubber Stack 161W. In each of those hours, Century Aluminum violated the PM emission limit of 1.5 lb/hr contained in 2002 Construction Permit (Section II.A.), 2003 Revised Title V Permit (Condition 5.D. Table 5.9), and 2021 Title V Permit (Condition C.24).

*Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack)*

195. Each hour from November 9, 2019 through October 5, 2020, Century Aluminum emitted PM at a rate that exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 19.65 lb/hr contained in 2002 Construction Permit (Condition II.D.18) and 2003 Revised Title V Permit (Condition 5.E.11).

196. Each hour from March 2, 2021 through November 1, 2021, Century Aluminum emitted PM at a rate that exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 19.65 lb/hr

contained in 2002 Construction Permit (Condition II.D.18) and 2003 Revised Title V Permit (Condition 5.E.11).

197. Each hour from December 2022 through March 2024, Century Aluminum emitted PM at a rate that exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 19.65 lb/hr contained in 2002 Construction Permit (Condition II.D.18) and 2003 Revised Title V Permit (Condition 5.E.11).

198. Each hour from October 2024 through February 2026, Century Aluminum has emitted PM at a rate that has exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum has violated the PM emission limit of 19.65 lb/hr contained in 2002 Construction Permit (Condition II.D.18) and 2003 Revised Title V Permit (Condition 5.E.11).

199. Each hour beginning October 2024 through February 2025, Century Aluminum emitted PM at a rate that exceeded 28.73 lb/hr from the Mt. Holly Smelter's Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 28.73 lb/hr contained in 2023 Invalid PSD Permit (Condition 5) and 2023 Invalid Title V Permit (Condition C.23).

200. Each hour beginning October 2025 through December 2025, Century Aluminum emitted PM at a rate that exceeded 28.73 lb/hr from the Mt. Holly Smelter's Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 28.73 lb/hr contained in 2023 Invalid PSD Permit (Condition 5) and 2023 Invalid Title V Permit (Condition C.23).

*Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack)*

201. Each hour from March 2022 through December 2022, Century Aluminum emitted PM at a rate that exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 19.65 lb/hr contained in 2002 Construction Permit (Condition II.D.18) and 2003 Revised Title V Permit (Condition 5.E.11).

202. Each hour from March 2023 through March 2024, Century Aluminum emitted PM at a rate that exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 19.65 lb/hr contained in 2002 Construction Permit (Condition II.D.18) and 2003 Revised Title V Permit (Condition 5.E.11).

203. Each hour from October 2024 through the present, Century Aluminum has emitted PM at a rate that has exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum has violated the PM emission limit of 19.65 lb/hr contained in 2002 Construction Permit (Condition II.D.18) and 2003 Revised Title V Permit (Condition 5.E.11).

204. Each hour beginning October 2024 through February 2025, Century Aluminum emitted PM at a rate higher than 28.73 lb/hr from the Mt. Holly Smelter's Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 28.73 lb/hr contained in 2023 Invalid PSD Permit (Condition 5) and 2023 Invalid Title V Permit (Condition C.23).

205. Each hour beginning October 2025 through February 2026, Century Aluminum emitted PM at a rate higher than 28.73 lb/hr from the Mt. Holly Smelter's Potline #1 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 28.73 lb/hr contained in 2023 Invalid PSD Permit (Condition 5) and 2023 Invalid Title V Permit (Condition C.23).

*Potline #2 Ridge Vent West*

206. Each hour beginning May 2022 through April 2024, Century Aluminum emitted PM at a rate that exceeded 18.15 lb/hr from the Mt. Holly Smelter's Potline #2 Ridge Vent West. In each of those hours, Century Aluminum violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.) and 2021 Title V Permit (Condition C.23).

207. Each hour beginning November 2024 through the present, Century Aluminum has emitted PM at a rate that has exceeded 18.15 lb/hr from the Mt. Holly

Smelter's Potline #2 Ridge Vent West. In each of those hours, Century Aluminum has violated the PM emission limit of 18.15 lb/hr contained in 2002 Construction Permit (Section II.A.) and 2021 Title V Permit (Condition C.23).

*Potline #2 Scrubber Stack 162W*

208. Each hour from March 2023 through March 2025, Century Aluminum has emitted PM at a rate that has exceeded 1.5 lb/hr from the Mt. Holly Smelter's Potline #2 Scrubber Stack 162W. In each of those hours, Century Aluminum has violated the PM emission limit of 1.5 lb/hr contained in 2002 Construction Permit (Section II.A.) and 2021 Title V Permit (Condition C.24).

*Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack)*

209. Each hour from May 2022 through the present, Century Aluminum has emitted PM at a rate that has exceeded 19.65 lb/hr from the Mt. Holly Smelter's Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum has violated the PM emission limit of 19.65 lb/hr contained in 2002 Construction Permit (Condition II.D.18), 2003 Revised Title V Permit (Condition 5.E.11), and 2021 Title V Permit (Condition C.24).

210. Each hour beginning April 2024 through February 2025, Century Aluminum emitted PM at a rate that exceeded 28.73 lb/hr from the Mt. Holly Smelter's Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 28.73 lb/hr

contained in 2023 Invalid PSD Permit (Condition 5) and 2023 Invalid Title V Permit (Condition C.23).

211. Each hour beginning November 2025 through March 2026, Century Aluminum emitted PM at a rate that exceeded 28.73 lb/hr from the Mt. Holly Smelter's Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack). In each of those hours, Century Aluminum violated the PM emission limit of 28.73 lb/hr contained in 2023 Invalid PSD Permit (Condition 5) and 2023 Invalid Title V Permit (Condition C.23).

*Anode Bake Furnace*

212. Each hour from November 9, 2019 through September 24, 2020, Century Aluminum emitted PM at a rate that exceeded 4.91 lb/hr from the Mt. Holly Smelter's Anode Bake Furnace. In each of those hours, Century Aluminum violated the PM emission limit of 4.91 lb/hr contained in 2002 Construction Permit (Section II.A.) and 2003 Revised Title V Permit (Condition 5.D. Table 5.9).

213. For each ton of green anodes processed from November 9, 2019 through October 15, 2020, Century Aluminum emitted PM at a rate that exceeded 0.20 lb/ton of green anodes processed from the Mt. Holly Smelter's Anode Bake Furnace. In each of those hours, Century Aluminum violated the PM emission limit of 0.20 lb/ton of green anodes processed contained in 40 C.F.R. § 63.843(c)(3) and 2021 Title V Permit (Condition E.4).

214. Plaintiff Sierra Club has a cause of action for each violation alleged in this claim for relief pursuant to 42 U.S.C. § 7604(a)(1).

215. Unless restrained by an order of this Court, these and similar violations of PM emission limitations applicable to the Mt. Holly Smelter will remain ongoing.

**Sierra Club's Second Claim for Relief**

**Violations of Total Fluorides Emission Limits**

216. Sierra Club realleges and incorporates all preceding paragraphs by reference.

217. Each day from March 2, 2021 through April 28, 2021, Century Aluminum emitted TF at a rate that exceeded 1.9 lb/ton of aluminum produced (single month average) from the Mt. Holly Smelter's Potline #1 East and West Potroom Groups (Ridge Vent plus Scrubber Stack), thereby violating the emission limit of 1.9 lb/ton of aluminum produced (single month average) contained in 40 C.F.R. §63.843(a)(1)(i).

218. Each day from March 2, 2021 through April 28, 2021, Century Aluminum emitted TF at a rate that exceeded 1.34 lb/ton of aluminum produced (single month average) from the Mt. Holly Smelter's Potline #1 East Potroom Group (Ridge Vent plus Scrubber Stack), thereby violating the emission limit of 1.34 lb/ton of aluminum produced (single month average) contained in 2002 Construction

Permit (Condition II.D.11) and 2003 Revised Title V Permit (Condition 5.D Table 5.9).

219. Each day from March 22, 2024 through September 19, 2024, Century Aluminum emitted TF at a rate that exceeded 1.9 lb/ton of aluminum produced (single month average) from the Mt. Holly Smelter's Potline #2 West Potroom Group (Ridge Vent plus Scrubber Stack), thereby violating the emission limit of 1.9 lb/ton of aluminum produced (single month average) contained in 40 C.F.R. § 63.843(a)(1)(i), 2002 Construction Permit (Condition II.D.11), 2021 Title V Permit (Condition E.4), and 2023 Invalid Title V Permit (Condition E.4).

220. Each day from November 7, 2022 through June 30, 2025, Century Aluminum emitted TF at a rate that exceeded 1.02 lb/ton aluminum produced (12-month rolling average) from the Mt. Holly Smelter potlines, as a plantwide average, thereby violating the emission limit of 1.02 lb/ton aluminum produced (12-month rolling average) contained in 2002 Construction Permit (Conditions II.A. & II.D.11), 2021 Title V Permit (Condition C.28), and 2023 Invalid Title V Permit (Condition C.27).

221. Each day beginning October 2021 through December 2022, Century Aluminum emitted TF at a rate that exceeded 1.34 lb/ton aluminum produced (single-month average) from the Mt. Holly Smelter potlines, as a plantwide average, thereby violating the emission limit of 1.34 lb/ton aluminum produced (single month

average) contained in 2002 Construction Permit (Condition II.D.11), 2021 Title V Permit (Condition C.28), and 2023 Invalid Title V Permit (Condition C.27).

222. Each day beginning March 2023 through February 2024, Century Aluminum emitted TF at a rate that exceeded 1.34 lb/ton aluminum produced (single-month average) from the Mt. Holly Smelter potlines, as a plantwide average, thereby violating the emission limit of 1.34 lb/ton aluminum produced (single-month average) contained in 2002 Construction Permit (Condition II.D.11), 2021 Title V Permit (Condition C.28), and 2023 Invalid Title V Permit (Condition C.27).

223. Each day beginning June 2024 through August 2024, Century Aluminum emitted TF at a rate that exceeded 1.34 lb/ton aluminum produced (single-month average) from the Mt. Holly Smelter potlines, as a plantwide average, thereby violating the emission limit of 1.34 lb/ton aluminum produced (single-month average) contained in 2002 Construction Permit (Condition II.D.11), 2021 Title V Permit (Condition C.28), and 2023 Invalid Title V Permit (Condition C.27).

224. Each day beginning March 2026 through the present, Century Aluminum emitted TF at a rate that exceeded 1.34 lb/ton aluminum produced (single-month average) from the Mt. Holly Smelter potlines, as a plantwide average, thereby violating the emission limit of 1.34 lb/ton aluminum produced (single-month average) contained in 2002 Construction Permit (Condition II.D.11), 2021 Title V Permit (Condition C.28), and 2023 Invalid Title V Permit (Condition C.27).

225. Each day beginning March 2026 through the present, Century Aluminum emitted TF at a rate that exceeded 1.9 lb/ton aluminum produced (single-month average) from the Mt. Holly Smelter potlines, as a plantwide average, thereby violating the emission limit of 1.9 lb/ton aluminum produced (single-month average) contained in 2021 Title V Permit (Conditions C.31, E.4), and 2023 Invalid Title V Permit (Conditions C.30, E.4), and 40 C.F.R. § 63.843(a)(1)(i).

226. Plaintiff Sierra Club has a cause of action for each violation alleged in this claim for relief pursuant to 42 U.S.C. § 7604(a)(1).

227. Unless restrained by an order of this Court, these and similar violations of TF emission limitations applicable to the Mt. Holly Smelter will remain ongoing.

## Sierra Club's Third Claim for Relief

### Violations of the Limit on the Sulfur Content of Petroleum Coke Used to Form Anodes

228. Sierra Club realleges and incorporates all preceding paragraphs by reference.

229. From at least June 1, 2023 through October 31, 2025, Century Aluminum, in forming the anodes at the Mt. Holly Smelter, used petroleum coke with a sulfur content that exceeded 2.22% by weight based upon a monthly average, thereby violating the requirement that "[t]he sulfur content of the coke used in forming the anodes [at the Mt. Holly Smelter] shall not exceed 2.22% by weight

based upon a monthly average." 2002 Construction Permit (Condition II. D.9); 2008 Construction Permit (Conditions II.A. & II.D.11); 2021 Title V Permit (Condition C.15).

230. Plaintiff Sierra Club has a cause of action for each violation alleged in this claim for relief pursuant to 42 U.S.C. § 7604(a)(1).

231. Unless restrained by an order of this Court, these violations of the limit on the sulfur content of petroleum coke used to form anodes will remain ongoing at the Mt. Holly Smelter.

**Sierra Club's Fourth Claim for Relief**

**Violations of Source PSD Obligations Due to**

**the Relaxation of the Petroleum Coke Sulfur Content Limit**

232. Sierra Club realleges and incorporates all preceding paragraphs by reference.

233. If the 2023 Title V Permit revision, which increased the 2.22% coke sulfur content limit to 3.0%, is considered valid, despite the EPA's November 2, 2023 Order objecting to the permit modification, then the relaxation of the petroleum coke sulfur content limit rendered the original modification at the Mt. Holly Smelter permitted in the 2002 Construction Permit a major modification for $SO_2$ emissions.

234. In 2001, the Mt. Holly Smelter (via its then-operator Alcoa) sought to increase allowable production from 234,274 tons per year of aluminum to 256,150 tons per year of aluminum, a 9.34% production rate increase.

235. To determine if a physical and/or operational change would be a major modification, actual emissions before the change must be compared to potential to emit after the change under the PSD rules applicable in 2002. *See* S.C. Reg. 61-62.5, Standard No. 7, §§ (b)(2)-(4) (defining major modification, net emissions increase, and potential to omit), (b)(21)(ii) & (iv) (defining actual emissions), & (b)(23)(i) (defining $SO_2$ significance threshold) (Oct. 26, 2001).[3]

236. To minimize the net emissions increase in $SO_2$ emissions associated with the requested increase in production, the Mt. Holly Smelter accepted restrictions in the 2002 Construction Permit that lowered the average allowable sulfur content in the petroleum coke and tar pitch used at the plant.

237. In particular, the restrictions lowered the monthly average allowable sulfur content in the petroleum coke used at the plant to 2.22%. 2002 Construction Permit (Condition II.D.9). Without that restriction, the operation of the Mt. Holly Smelter potlines at the increased aluminum production rate would have resulted in a significant net emissions increase in $SO_2$ emissions and would have constituted a

[3] *See* 67 Fed. Reg. 30594 (May 7, 2002); 40 C.F.R. § 52.2120(c) (July 1, 2002).

major modification for $SO_2$ subject to PSD permitting. Absent that restriction, the increase in production would have caused the plant to exceed the applicable PSD permitting emission thresholds.

238. Accordingly, on November 19, 2002, SCDES issued the 2002 Construction Permit to the Mt. Holly Smelter with the sulfur content limits of 2.22% for petroleum coke and 0.85% for tar pitch. These limits allowed the smelter to "net out" of PSD requirements for $SO_2$, while increasing aluminum production to 256,156 tons per year.

239. On or about November 19, 2002, the Mt. Holly Smelter commenced operation at the higher aluminum production rate and with the 2.22% coke sulfur content limit and the 0.85% pitch sulfur content limit.

240. The 2008 Construction Permit also made clear that the petroleum coke sulfur content limit was a PSD "avoidance" limit taken "[i]n order to remain synthetic minor for" PSD. 2008 Construction Permit (Condition D.11).

241. If the April 13, 2023 Title V Permit revision, in fact, allowed the Mt. Holly Smelter to use petroleum coke with a sulfur content of up to 3.0% (despite EPA's objection), then SCDES relaxed a limit that was essential to the 2002 increase in aluminum production. The 2.22% sulfur content limit allowed the smelter to avoid PSD requirements for $SO_2$. Consequently, when SCDES relaxed the 2.22% limit to

3.0%, the change resulted in a major modification for $SO_2$ emissions requiring a PSD permit.

242. Each day that the Mt. Holly Smelter has operated beginning April 13, 2023 onward without meeting the requirements of S.C. Reg. 61-62.5, Standard No. 7, §§ (J)-(R), including the requirement to apply BACT for $SO_2$ emissions, *id.* § (J)(3), Century Aluminum has violated and continues to violate its PSD obligations at 42 U.S.C. § 7475(a)(1) & (a)(4) (obligation to secure a PSD permit and apply BACT before making a major modification), S.C. Reg. 61-62.5, Standard No. 7, § (A)(2)(c) (same), S.C. Reg. 61-62.5, Standard No. 7, § (R)(4) (including, but not limited to, the requirement of § (J)(3) to apply BACT for $SO_2$).

243. As of April 13, 2023, Century Aluminum was required to comply with the requirements of §§ (J) through (R) of S.C. Regulation 61-62.5, Standard No. 7 as though construction had not yet commenced on the 2002 major modification at the Mt. Holly Smelter, because the increase in the coke sulfur content limit to 3.0% rendered the 2002 modification a major modification for $SO_2$ emissions.

244. In addition, each day that the Mt. Holly Smelter has operated since April 13, 2023, Century Aluminum has violated and continues to violate 42 U.S.C. § 7661a(a), which requires an owner or operator to procure a Title V permit that incorporates requirements from a PSD permit and to operate in compliance with that Title V permit, and S.C. Regulation 61-62.70, § 70.5(a)(1)(ii), which also requires

an owner or operator to obtain a Part 70 (Title V) permit revision before commencing operation where the facility's Title V permit would prohibit such construction or change in operation. The Title V permit prohibits noncompliance with any applicable law or regulation, and prohibits construction without applying for and receiving a PSD permit addressing the major modification. *See, e.g.*, 2023 Title V Permit, Condition M.24, M.25, & M.9.

245. Plaintiff Sierra Club has a cause of action for each violation alleged in this claim for relief pursuant to 42 U.S.C. § 7604(a)(1) and (a)(3).

246. Unless restrained by an order of this Court, these and similar violations of 42 U.S.C. §§ 7475(a) and 7661a(a), and the South Carolina SIP PSD regulations and Title V Program regulations, will remain ongoing.

**Sierra Club's Fifth Claim for Relief**

**Violations of PSD Obligations and Title V Obligations by Making Physical and/or Operational Changes that Led to Significant PM Emissions Increases**

247. Sierra Club realleges and incorporates all preceding paragraphs by reference.

248. On information and belief, after the Smelter's potroom PM emissions limits changed in January 2023, the plant undertook physical changes and/or changes in the method of operation at the potrooms, including, for example, operating with inferior air pollution control practices. These physical changes and/or operational

changes resulted in a significant emissions increase and a significant net emissions increase in PM, $PM_{10}$, and $PM_{2.5}$ from the Mt. Holly Smelter, and therefore constituted a major modification for these pollutants.

249. Indeed, in the years following the permit change, these changes resulted in at least a 100 ton per year increase in PM emissions and at least a 60 ton per year increase in $PM_{10}$ and $PM_{2.5}$ emissions at the Mt. Holly Smelter, which exceed PSD significance thresholds.

250. Since on or about January 12, 2023, with this unpermitted major modification for PM, $PM_{10}$, and $PM_{2.5}$, Century Aluminum has violated and continues to violate the Clean Air Act, South Carolina SIP, and South Carolina's Title V program.

251. Specifically, Century Aluminum violated and is continuing to violate applicable PSD obligations at 42 U.S.C. § 7475(a)(1) and (a)(4) (obligation to secure a PSD permit and apply BACT before making a major modification) and S.C. Regulation 61-62.5, Standard No. 7, § (A)(2)(c) and (J)(3) (same) by making a major modification for PM, $PM_{10}$, and $PM_{2.5}$ without obtaining a PSD permit that meets the requirements of §§ (J) through (R) of S.C. Regulation 61-62.5, Standard No. 7.

252. Each day that the Mt. Holly Smelter operated since on or about January 12, 2023 without a permit that meets the requirements of 42 U.S.C. § 7475(a) and

S.C. Regulation 62-62.5, Standard No. 7, and without complying with BACT emission limits for PM, $PM_{10}$, and $PM_{2.5}$, constitutes a separate violation.

253. Additionally, Century Aluminum violated and is continuing to violate Title V obligations by operating the Mt. Holly Smelter without complying with its Title V permit and without applying for and obtaining a Title V permit revision that incorporated requirements from a PSD permit issued to address the major modification. 42 U.S.C. § 7661a(a) makes it unlawful for a person to violate a condition of a Title V permit or to operate a source in violation of a Title V permit. S.C. Regulation 61-62.70, § 70.5(a)(1)(ii) also prohibits operation of a source where the existing Part 70 (Title V) permit prohibits such construction or change in operation. The existing Title V permit prohibits noncompliance with any applicable law or regulation, and prohibits construction without applying for and receiving a PSD permit addressing the major modification. *See, e.g.*, 2021 Title V Permit Conditions M.24, M.25, & M.9.

254. Each day that the Mt. Holly Smelter operated since it made the major modification on or about January 12, 2023, it has operated and continues to operate in violation of its Title V permit and without a Title V permit revision. Century Aluminum has been and continues to be in violation of 42 U.S.C. § 7661a(a) and S.C. Regulation 61-62.70, § 70.5(a)(1)(ii).

255. Plaintiff Sierra Club has a cause of action for the violations alleged in this claim for relief pursuant to 42 U.S.C. § 7604(a)(1) and (a)(3).

256. Unless restrained by an order of this Court, these and similar violations of 42 U.S.C. §§ 7475(a) and 7661a(a), and the South Carolina SIP PSD Regulation and Title V Program, will remain ongoing.

**Sierra Club's Sixth Claim for Relief**

**Violations of Good Air Pollution Control Requirements**

**Required by 40 C.F.R. § 63.843(f)**

257. Sierra Club realleges and incorporates all preceding paragraphs by reference.

258. From at least February 1, 2021 onward, Century Aluminum has operated the potlines at the Mt. Holly Smelter in a manner inconsistent with safety and good air pollution control practices for minimizing emissions, as required by 40 C.F.R. § 63.843(f). Such actions include, but are not limited to:

- failing to operate four fans for pot exhaust removal;
- failing to establish a method (e.g., algorithm) for calculating monthly PM emissions from the potline roof vents;
- failing to respond to each potroom baghouse bag leak detector alarm (Unit ID 04, Control Device IDs 53002, 53003, 53004, & 53005) to initiate corrective action on individual baghouse compartments in order to prevent or minimize

the frequency of visible emissions events at the baghouse stack exits (Source IDs 02, 03, 04 & 05);

- failing to maintain a record of all potroom baghouse compartment bag leak detector alarms and corrective action responses;
- failing to verify that the bag leak detectors installed at the baghouse stacks conform to the requirements of 40 C.F.R. § 63.848(o)(1) and (2);
- failing to establish a baghouse pressure drop range for each baghouse compartment that provides a reasonable assurance of compliance with PM emission limits and opacity limits for control devices (Control Device IDs 53002, 53003, 53004 & 53005);
- failing to ensure the potline baghouse pressure drop gauges are capable of delivering alarm signals that alert operators when an individual compartment's pressure drop deviates from the prescribed operating range;
- failing to have an adequate baghouse filter testing program;
- failing to maintain a historical record of bag failures, including the bag locations (cell #, bag #) and date, to identify areas within each cell/compartment that may be prone to more frequent failure;
- failing to identify potline equipment and pollution control equipment malfunctions that resulted in PM emission limit violations;
- failing to conduct timely corrective action to reduce emissions;

- failing to report equipment malfunctions according to permit requirements;
- failing to install, calibrate, certify, and operate PM continuous emission monitoring systems;
- failing to have adequate written plant operation and maintenance procedures;
- failing to have adequate employee training that, for example, would reduce the frequency of pot hood removal or opening of shields for crust management, bath chemistry, and temperature control; and
- failing to establish a record of pot hood opening date, time, and duration with notation of the reason for the opening (e.g., anode replacement, bath control, crust management).

259. Plaintiff Sierra Club has a cause of action for each violation alleged in this claim for relief pursuant to 42 U.S.C. § 7604(a)(1).

260. Unless restrained by an order of this Court, these and similar violations of 40 C.F.R. § 63.843(f) will remain ongoing.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Sierra Club respectfully requests that the Court grant the following relief:

261. Declare that Century Aluminum has violated and is continuing to violate the Clean Air Act;

262. Permanently enjoin Century Aluminum from operating the Mt. Holly Smelter except in accordance with the Clean Air Act, the South Carolina SIP, and all valid federally enforceable air quality permits;

263. Order Century Aluminum to remediate the environmental damage and ongoing impacts resulting from its violations;

264. Assess civil penalties against Century Aluminum, pursuant to 42 U.S.C. §§ 7413(b), 7604(a), and 40 C.F.R. Part 19.

265. Order that, pursuant to 42 U.S.C. § 7604(g)(2), a portion of the civil penalties assessed against Century Aluminum be used in beneficial mitigation projects to enhance public health and the environment in the areas where Sierra Club's members live, work, and recreate, and that are adversely impacted by Century Aluminum's illegal emissions;

266. Retain jurisdiction over this action to ensure compliance with the Court's Order;

267. Award Sierra Club its costs of litigation, including reasonable attorney fees, pursuant to 42 U.S.C. § 7604(d); and

268. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT

______s/Lauren Megill Milton__________
Lauren Megill Milton (Fed. ID No. 12272)
Benjamin D. Cunningham (Fed. ID No. 11905)
P.O. Box 1380 | Pawleys Island, SC | 29585
lauren@scelp.org | ben@scelp.org | (843) 527-0078

Michelle Fein *(pro hac vice application pending)*
Earthjustice | 48 Wall Street, 15th Floor | New York, NY 10005 | (917) 410-8792 | mfein@earthjustice.org

George E. Hays *(pro hac vice application pending)*
P.O. Box 843 | Bellevue, WA 98009
(415) 716-9159 | georgehays@mindspring.com

Marta Darby *(pro hac vice application pending)*
P.O. Box 61 | Truckee, CA 96160 | (503) 806-0774
darby.marta@gmail.com

Naomi Melver *(pro hac vice application pending)*
4730 University Way NE, Ste. 104, #347
Seattle, WA 98105 | (425) 336-3757 | nmelver@gmail.com

*Attorneys for Plaintiff Sierra Club*

Charleston, S.C.
October 29, 2026